The opinion of the Court was delivered by
Dunkin, C. J.
In 1858, Edward Parker Guerard, a planter of Georgetown District, was found of unsound mind. On 27th May, 1858, by an order of the Court of Equity, the plaintiff was appointed committee of the person of her husband, the said E. P. Guerard, and the defendant, Sextus T. Gaillard (who was the uncle of the plaintiff), upon giving bond, with approved security, in the sum of sixty thousand dollars, was appointed committee of the estate of the lunatic. By a subsequent order, 9th July, 1858, plaintiff was allowed twelve hundred dollars per annum, to be paid semi-annually, with a residence on the plantation and incidents thereto. It was said in the argument (although no copy of the order was before the Court), that nine hundred dollars per annum was also allowed for the maintenance of the lunatic at the asylum in Columbia. Under the authority thus vested in him, the defendant took charge of the plantation called Remsey Grove, on Black River, with the slaves thereon, and continued in the management of the same (as the witness Ford said) for six or seven years. He had a pounding mill on his own plantation, and the crops of Remsey Grove were pounded there. “ The practice was,” (says the witness,) “ to thrash out the rice omthe place, and then send it to defendant’s mill to be beat. The plaintiff) with her two children, resided on the plantation, but; *24 during such residence, the defendant had the control; but the witness (who was the overseer) was directed by the defendant to obey any orders the plaintiff might send for supplies or for her comfort.”
In the spring of 1865, Georgetown, with the surrounding country, fell into the hands of the United States troops. For some time, says the witness, Ool.-Benjamin Allston, the country was in a disturbed condition — property more or less in the possession of the negroes. In May, 1865, the lunatic, Edward P. Guerard, died.
In this condition of the country, and under this change of circumstances, it is important to inquire, what were the duties of the defendant? “On the death of the lunatic,” says Mr. Adams, in his Treatise on Equity, p.547 (2 Amer. Ed.), “ the power of administration is at an end, except as to orders which have been already made, or which are consequential on reports or petitions already made or presented. But the committee continues under the control of the Court, and will be ordered, on the application of the lunatic’s heir, to deliver up possession of the estate.” “ The practice is to restore possession by an order of the Court.” Among other authorities, he cites the instructive observations of Lord Bedesdale in the case Ex parte Fitzgerald, (2 Sch. & Lef. 439.) After stating the origin of the appointment, that the Court of Chancery was bound to provide for the care and custody of the person and estates of lunatics, he proceeds: “ The superintendence of the conduct of the committee in the management both of the property and the person, originates in the authority of the Court, itself, as the Court from which the commission inquiring of the lunacy issues.” “It is the duty of the Court to see that the committee does not use his office to the preju-. dice of the lunatic in his lifetime, or of those entitled to his property after his death.” “If on the death of the lunatic there were no dispute who was the heir, &c., and an appli *25 cation was made to the Court, stating the death of the lunatic, and praying that the committee might be ordered to deliver possession to the heir, I apprehend the Court ought to order possession to be delivered, and ought not to put the heir to his ejectment,” &c. And again; “ The person acting as committee must act with the most perfect impartiality ; and is not, as committee, to put himself, or any body else, into possession as heir, without the authority of the Court.” “As Mr. E., therefore, has thought fit to put himself into the situation of committee, and as such, is under the control of this Court, and (which control, I think, does not determine by the death of the lunatic) he continues liable to account, &c., and bound to act in delivering possession as the Court shall direct.’-’ His lordship made an order restraining the committee from receiving rents, &c., by virtue of the authority vested in him as committee, &c.
Being thus liable to account to the Court by which he was appointed, the defendant, on the death of the lunatic, was not at liberty to abandon the estate It was his duty to take such reasonable care of the property committed to his charge as a prudent man would exercise in the management of his own estate. Accordingly, on 4th July, 1865, he made a contract with the witness Ford, to take charge of the property and act as his agent for the rest of the year, and engaged to pay him for his services one hundred and fifty dollars on 1st January, 1866. It is part of the history of the country that by the military orders, proprietors, or their agents, were required to make contracts with the laborers. Ford said, “ the negroes were to get half the crop they made.” During the remainder of the season the business of the plantation was conducted and the crop made and harvested under the direction of Ford, as the agent of the defendant.
In November, the defendant delivered to the solicitor of *26 the plaintiff, the will of ber deceased husband, Edward W. Guerard, of which she was nominated executrix, with Arthur B. Eose as executor. The will was not proved until 29th January, 1866, and the plaintiff qualified as executrix on 10th February following.
In the meantime, after the witness Ford’s contract' for 1865 had expired, the “ defendant engaged him to go to Eemsey Grove plantation to finish thrashing out and dividing the crop, and instructed him to remove the rice.” He, the witness, had previously said that “the rice was not safe on the place in January, 1866; barns were broken open and rice stolen that year.” After getting these instructions the witness, “ on 9th January, went to the place accompanied by a Yankee soldier. A flat was sent for the rice. Defendant was there in the morning. Witness demanded the keys from the driver, opened the barn, and superintended the removal of the rice. It was done by the Oamfield negroes, and carried to defendant’s mill. The negroes were to get half the crop they made. Some were engaged dividing. Half of the crop was put in the flat and carried to Oamfield mill; remainder belonged to negroes. Shortly after removal of rice, defendant ceased to exercise control. Witness took away three hundred and odd bushels, left four hundred and odd on the place. Witness remained on the place after taking the rice, perhaps a week, because he had not finished thrashing.” He elsewhere said “ when I was re-employed, I was required to stay on the place with a soldier until he and I left, which was when I had thrashed out and divided the crop.” Another witness, William Green, testified that, on that day the plaintiff; who was residing in Georgetown, accompanied by the witness, went to Eemsey Grove. “As they drove in, they saw a lot of men, white and negroes, in the barn-yard, moving rice; they turned to go into the house where they *27 could see; bad no personal communication with any one but a soldier.”
His Honor, the presiding Judge, charged the jury that having already ruled that the office of committee expired at the death of the lunatic, “there were but two questions for them to decide. Was the removal of the rice by the defendant a tortious taking ? If they decide this question in the affirmative, then there was no necessity to prove a demand. Should they come to the conclusion that the taking was tortious, then the only other matter for their consideration was the amount of damages.”
The fifth ground of appeal is, “ because his Honor instructed the jury that, upon the death of the lunatic, the office and functions of the committee of his estate ceased, the right of the devisees vested immediately, and any further interference with the property by the committee was a trespass.” And in the first ground, it is submitted that “it was the duty of the defendant, as committee of the deceased lunatic, to retain possession and take care of the property committed to his charge, until he was relieved from further responsibility by the parties interested in the estate, or by the Court of Equity.” Prom the authorities already cited it is clear that the committee is vested with no legal title. He is considered (says Lord Eedesdale) in the nature of an officer, acting under the authority of which the Court has to take care of the property of the lunatic— “ a mere bailiff appointed by the Court, and under its control, to take care of the property — liable to account, to censure, to punishment, and to be removed, if he shall misconduct himself.” “ With respect to the recovery of the lunatic, it is clear that in practice, the lunatic is not restored to the possession but by order of Court, and for a manifest reason, for, otherwise, how is it to be ascertained that he is recovered ?” (JSx parte Fitzgerald, ut supra.) Again, “The Court must consider the committee like any other person *28 in the situation of a bailiff, manager or receiver, as one who is to act merely officially,” &c., “ and if on the death of the lunatic, there be no dispute who is the heir, the committee will be ordered^by the Court to deliver possession to the heir.” The committee, like any other officer of the Court, manager, receiver, &c., may undertake to act for himself and without an order, and deliver possession to a party whom he supposes restored to his senses, or one whom he regards ■as legally entitled to the estate in his custody, but he does so on his official responsibility, and with liability to account for the consequences of any'error he may commit in acting without an order. If on the 9th January, 1866, the defendant had delivered possession to the plaintiff, who had afterwards renounced the executorship, and letters were granted to A. B. Rose, it is not easy to perceive on what ground the defendant could resist the application of the rightful executor for the proper orders, or evade his official responsibility. But the question does not arise. In removing the rice and having it prepared^ for market, the defendant committed no trespass; did no wrong. He did no more than his duty required. The same state of things existed on 1st January, 1866, as had existed on 1st June, .1865. If his taking the rice, on 9th January, was -tortious, he committed a trespass when he planted the land after the lunatic’s death in May, 1865, and his contract with Ford for the' management of the property on 4th July, 1865, was an unlawful intermeddling.
The Court is of opinion that the defendant’s motion for a non-suit ought to have been granted; and it is now so ordered and adjudged.
Wakdlaw, and Inglis, A. JJ., concurred.

Motion granted.